FILED
2020 Oct-28  PM 01:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **ERIC COPPOLO,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:19-CV-00507-RDP** |
| | } | |
| **ANDREW SAUL, Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OF DECISION</u>

Eric Coppolo ("Plaintiff") brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI").  *See also*, 42 U.S.C. §§ 405(g) and 1383(c).  Based on the court's review of the record and the briefs submitted by the parties,[1] the court finds that the decision of the Commissioner is due to be affirmed.

---

[1] The court found the records and briefs in this case (as is the situation in other cases Plaintiff's counsel has recently been involved with) to be overly voluminous for a number of reasons: the submission of duplicative documents/records, repetitive cut-and pasting of information, repeatedly restating the record and previous information, recycling and arguing issues that were previously decided in the Eleventh Circuit, and not clearly stating what error(s) are being pursed. Plaintiff's counsel should focus on the issues that matter and that are winnable. *See generally*, ANTONIN SCALIA & BRYAN A. GARNER, MAKING YOUR CASE: THE ART OF PERSUADING JUDGES 22-23 (2008) ("The most important—the very most important—step you will take … before a trial court or an appellate court, is selecting the arguments that you'll advance."); MARCUS TULLIUS CICERO, DE INVENTIONE 345 (H.M. Hubbell trans., Harvard Univ. Press 1949) (describing the selection of arguments as "the first and most important part of rhetoric"). *See also*, *United States v. Friedman*, 971 F.3d 700, 709-10 (2020) ("Before turning to the merits, a word must be said on the lack of effectiveness of making so many claims of error. "[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal."); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) (admonishing a "'kitchen sink' approach" to advancing issues on appeal. The claims chosen should be few and carefully measured for maximum effect. A circumspect approach boosts credibility, while raising every conceivable challenge on appeal can dilute the persuasiveness of plausible arguments. For these reasons we have cautioned: "[A] brief that treats more than three or four matters runs a serious risk of becoming too diffused and giving the overall impression that no one claimed error can be very serious."); Practitioner's Handbook for Appeals to the

## I.      Proceedings Below

On October 3, 2014, Plaintiff filed his applications for disability, DIB, and SSI.  (R. 434-40, 461). In his applications, Plaintiff alleged a disability onset date of March 25, 2014. (R. 434, 437). The Social Security Administration denied Plaintiff's application for SSI on October 24, 2014 (R. 175, 461),[2] and for disability and DIB on November 26, 2014. (R. 147, 184). On December 2, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 190). A hearing was scheduled for April 21, 2016 before ALJ Ronald Reeves. (R. 218).  That hearing was convened, but then continued and rescheduled for July 26, 2016.[3] (R. 107-22, 123-46, 218, 255). During the July 26, 2016 hearing,[4] Jewel Euto, a Vocational Expert, was present and provided vocational testimony. (R. 131-35).

On February 1, 2017, the ALJ entered his decision and determined Plaintiff was not eligible for a period of disability, DIB, or SSI benefits because he failed to meet the disability requirements of the Act and retained the residual functional capacity to perform medium work, including past relevant work as an irrigation installer. (R. 151-60). On February 9, 2017, Plaintiff requested the Appeals Council to review the ALJ's decision.  (R. 321). Plaintiff's request was granted and the

---

United States Court of Appeals for the Seventh Circuit 139 (2019); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 359 (7th Cir. 1987) (quoting same). Tempting as it may be to call foul on every perceived trial error, that strategy generally produces diminishing returns. "Legal contentions, like the currency, depreciate through over-issue." Robert H. Jackson, Advocacy Before the Supreme Court, 37 CORNELL L.Q. 1, 5 (1951). The approach taken by counsel has contributed to extra resources being expended in addressing this case and has contributed to a delay in resolving it.

[2] Plaintiff's SSI denial letter stated he had "too much income to be eligible for SSI."  (R. 175). Plaintiff filed a second application for SSI on April 1, 2015.  (R. 449-455, 462).

[3] Dr. Alexandre Todorov was in attendance telephonically to provide medical expert testimony.  However, several medical records submitted prior to the hearing had not been exhibited at the time of the hearing and could not be found in the system.  (R. 125). The hearing was continued. (R. 605). Dr. Todorov did complete medical interrogatories sent to him by the ALJ on August 18, 2016.  (R. 1221-229).

[4] Due to telephonic connection issues, a medical expert was unable to provide testimony during this hearing. (R. 129).

ALJ's decision was reviewed under the substantial evidence and additional evidence provisions of the Social Security Administration regulations. (R. 168-70).

The Appeals Council found that additional evidence submitted by Plaintiff—a psychological evaluation completed by Dr. David R. Wilson on April 4, 2017 (R. 1236-243)—to be new, material and related to the period at issue; the Appeals Council also concluded that it had a reasonable probability of changing the decision's outcome. (R. 168). Additionally, the Appeals Council found the ALJ's decision failed to assess what weight should be given to the opinion of Dr. Adam Alterman, Plaintiff's treating physician. (R. 168-69). On July 17, 2017, under the authority of 20 C.F.R. §§ 404.977 and 416.1477, the Appeals Council vacated the hearing decision and remanded the case to the ALJ for further proceedings. (R. 167). On July 24, 2017, Plaintiff was notified of the remand decision.  (R. 334).

After remand, a hearing before ALJ Reeves was scheduled for January 18, 2018.[5] (R. 349). During that hearing, Dr. Richard Cohen provided medical expert testimony that Plaintiff met the criteria of both Sections 12.04 and 12.06 of the Act as of January 17, 2017. (R. 98-106, 105).  The ALJ, with the concurrence of Plaintiff's counsel, believed that was dispositive of the issue, and the hearing was concluded.  A second hearing was later scheduled for June 21, 2018. (R. 63-106, 389). During that hearing, Dr. Jonas provided medical expert testimony (R. 65-81), and Vocational Expert Claude Peacock provided vocational testimony. (R. 90-95).

In the ALJ's September 7, 2018 decision, he found that Plaintiff has the severe impairments of meralgia paresthetica, lumbar degenerative disc disease, obesity, bipolar disorder, anxiety disorder, and substance abuse.  And, based on the application for a period of disability and

---

[5] On or about January 9, 2018, Plaintiff requested that the ALJ recuse himself from the proceedings, suggesting the ALJ is biased and contending he had not received a fair hearing previously.  This request was denied and ALJ Reeves continued on with Plaintiff's case. (R. 384, Doc. #9 at 3, 59).

disability insurance benefits filed on October 3, 2014, the ALJ concluded "[Plaintiff] is not disabled under sections 216(i) and 223(d) of the Social Security Act." (R. 19-50).   More specifically, he found Plaintiff's

> substance use disorder is a contributing factor material to the determination of disability because [Plaintiff] would not be disabled if he stopped the substance use (20 C.F.R. §§ 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, [Plaintiff] has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(R. 19-50). After the Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 20, 2019, that decision became the final decision of the Commissioner and therefore a proper subject of this court's appellate review. (R. 1).

At the time Plaintiff filed his applications on October 3, 2014, he was 39 years old with the equivalent of a high school education. (R. 549, 556). His previous work experience was that of a landscape worker and landscape supervisor. (R. 90, 556). Plaintiff alleges he is disabled due to severe physical and mental conditions. (Doc. #9 at 3). Physically, Plaintiff alleges he suffers from severe substernal chest pain, cerebral vascular accident, low back pain due to sciatica, and inguinal hernia repair with complications of femoral nerve injury causing severe left leg pain due to idiopathic peripheral autonomic neuropathy. (Doc. #9 at 49-50). Plaintiff also alleges he suffers from bipolar I disorder—mixed severe, anxiety disorder with panic attacks, and major depressive disorder. (*Id.*).  Plaintiff testified that he is unable to work "because of lack of function in [his] left leg" after his second surgery, on March 25, 2014, which removed the mesh material placed during his initial laparoscopic left inguinal hernia repair surgery on August 5, 2013. (R. 1085-86).

On or about April 24, 2013, Plaintiff developed the onset of lower abdominal pain after lifting large decorator pots filled with dirt and gravel while on the job with a landscaping company.

(R. 456, 792, 967, 1026). A CT scan ordered by Dr. Sharon Haynes showed a small left side, inguinal hernia. (R. 1367). Plaintiff was referred to Dr. Charles Newman for consultation and an appointment was scheduled for a July 31, 2013 visit.  (R. 971-73, 1368). On August 5, 2013, Dr. Newman performed laparoscopic initial inguinal hernia repair on Plaintiff's left side. (R. 798). Plaintiff then followed up with Dr. Newman at least nine times, from August 2013 to March 2014, with complaints of post-operative pain, lower back pain, numbness and tingling in his leg. (R. 777-91). Dr. Newman noted during Plaintiff's March 11, 2014 appointment that Plaintiff had been "unresponsive to non operative therapy. Will pursue surgical removal of lateral mesh." (R. 778). On March 25, 2014, Plaintiff underwent a revision surgery to remove mesh material placed during his initial surgical hernia procedure. (R. 800). Plaintiff continued to experience post-op pain in his left groin and thigh.  Dr. Newman advised Plaintiff that "there was nothing else he could do," and Plaintiff sought treatment from Dr. Turnley, a physical medicine and rehabilitation specialist, from July to October 2014. (R. 805). Dr. Turnley's assessment was lateral cutaneous nerve pain and meralgia paresthetica, and recommended a nerve block. (R. 808). After the nerve block, Plaintiff reported he was still experiencing pain, as well as numbness. (R. 810, 813). Dr. Turnley ordered Nerve Conduction Velocity ("NCV") and electromyogram ("EMG") testing. (*Id.*). On October 15, 2014, Dr. Turnley reported the testing showed no evidence of injury to the femoral motor nerve and found mild slowing in conduction velocity of two motor nerves (which he deemed of uncertain medical significance). (R. 814).

On October 17, 2014, Plaintiff was referred by Dr. Turnley for a functional capacity evaluation. (R. 1077). Dr. Greg Hickey diagnosed Plaintiff with left thigh pain, status post left inguinal hernia repair. It was noted Plaintiff scored approximately six out of eight in assessed validity criteria for a validity score of 75%. (R. 1077). Validity scores of less than 80% are

considered indicative of inappropriate participation in the evaluation to the extent that there could not be a recommendation made for work/physical restrictions. (*Id*.).

Plaintiff had a second functional capacity evaluation performed on October 30, 2014. (R. 1081-83). Plaintiff was found to have a 53 pound lifting limitation with additional limitations in work or job task activity.[6] (R. 1082). On November 4, 2014, Plaintiff presented to the emergency room with complaints of groin pain. (R. 822). Plaintiff's degree of pain was listed as moderate, and he stated he had been having increased pain since having two function capacity evaluations in the past 18 days. (R. 822-27). Plaintiff was discharged and advised to follow up with his surgeon, Dr. Newman. (R. 823). Upon referral by Dr. Newman, on March 26, 2015, Plaintiff again had NCV and EMG testing performed. (R. 1216). All nerve conduction studies were within normal limits, and all examined muscles showed no evidence of electrical instability. (*Id.*). However, it was reported that left lateral cutaneous femoral nerve palsy, *i.e.* meralgia paresthetica, could not be ruled out. (*Id.*).

Plaintiff was treated by Dr. Charles Carnel at Alabama Orthopedic, Spine and Sports Medicine Associates various times from April 2015 to January 2017. (R. 896, 990, 992, 994, 1007, 1232, 1330, 1332). Plaintiff first saw Dr. Carnel on April 27, 2015 with complaints of leg pain. (R. 994). Dr. Carnel recommended Plaintiff begin physical therapy for meralgia paresthetica and prescribed 75mg of Lyrica. (R. 996). Further, Plaintiff completed a drug testing report.[7] (R. 1004). Plaintiff participated in physical therapy in June and July 2015 at Rehab Partners. (R. 899-922). It

---

[6] Additional limitations included occasional reaching overhead/elevated work, frequent standing (dynamic standing), occasional to frequent walking at a self-directed pace, occasional stair climbing, constant sitting with the ability to shift and adjust at his discretion, occasional kneeling, crouching, and stooping. (R. 1082).

[7] Plaintiff tested negative for the following drugs: Amphetamines, Barbiturate, Benzodiazepine, Cocaine Metabolite, Cannabinoid, Oxycodone, EDDP, Creatine, Opiate, Buprenorphine, and Heroin. (R. 1004).

was noted that Plaintiff complained of stabbing pain in the left groin and quad at each visit, and put forth minimal effort during his exercises. (*Id*.).

Plaintiff continued with complaints of persistent pain in his left groin area, hip, and lower back during his visits with Dr. Carnel. (R. 990-1002, 1330). During a December 5, 2016 visit, Plaintiff reported that "he feels that there are issues with motor function to the left lower extremity" of which Dr. Carnel noted "I do not have any objective findings to support this. MRI does not reveal any high-grade neurocompression. EMG/NCS does not show clear neurocompression or issues related to [Plaintiff]'s prior inguinal hernia repair surgery." (R. 1334). On January 30, 2017, Dr. Carnel noted that he spoke with Plaintiff at length about a positive drug screen for marijuana, and offered further treatment with non-opioid medications for his pain. (R. 1335-36). Plaintiff indicated he was not interested in "these mediations" as he is "unable to take anything that alters his mood." (R. 1336). Dr. Carnel indicated to Plaintiff that if he did not want to continue trying medications similar to prior medications he had been given, he had nothing else to offer him. (*Id*.). Plaintiff became belligerent, using foul language; Dr. Carnel ended the office visit. (*Id*.). Dr. Carnel concluded "there is no electrodiagnostic evidence of compressive neuropathy, generalized neuropathy, nerve compression, or acute radiculopathy" as "[m]ultiple workups from [Plaintiff's] authorized surgeon [] are reportedly negative." No further treatment was indicated. Dr. Carnel recommended Plaintiff return to work at full duty as before. (R. 1336).

Plaintiff was also treated by Dr. Darrell Prime, a cardiologist, following a September 2015 emergency room visit for generalized weakness and shortness of breath. (R. 1044). Outpatient stress testing was recommended. A stress test was performed on October 5, 2015, showing negative results. (R. 1018, 1045). On October 9, 2015, Dr. Prime diagnosed Plaintiff with chest pain, hyperlipidemia, obesity, ischemic stroke, stroke/cerebrovascular accident, fatigue, anxiety

disorder, nicotine dependence, and tobacco abuse. (R. 1017). Dr. Prime noted, however, that there was a possibility that Plaintiff had had a stroke on presentation to the hospital in September 2015, and additional testing would be obtained. (*Id*.). Plaintiff had a CT scan of his head on October 9, 2015, which showed no acute intracranial process. (R. 1063). In April 2016, Dr. Prime reported results from a recent stress test were normal, but Plaintiff continued to complain of severe chest pain with stress. (R. 1165). Dr. Prime suspected Plaintiff's anxiety was provoking angina and, therefore, increased his Elavil medication. (R. 1168).

Plaintiff also sought treatment from Dr. Adam Alterman, a family physician, beginning in October 2015. (R. 1032). Plaintiff's complaints throughout his treatment included abnormalities in his left foot, anxiety, depression, bipolar disorder, weight gain, chest pain, and falls/loss of balance. (R. 1019-38). Dr. Alterman's diagnoses included idiopathic peripheral autonomic neuropathy, major depressive disorder, hypercholesterolemia, and lumbago with sciatica left side. (*Id*.). Plaintiff was again seen by Dr. Alterman on March 16, 2016. Upon general examination, Plaintiff's general appearance was noted as in no acute distress, uses a cane,  describing moderate anxiety that had been present for months—started gradually and has gotten worse, and his overall condition is worsening. Also on March 16, 2016, Dr. Alterman completed a medical information form provided to him by Plaintiff's counsel. (R. 1039-41). Dr. Alterman reported that he treated Plaintiff for neuropathy secondary to nerve damage, hypertension, and chronic pain. (*Id*.). He noted, "[symptoms] began 3/2014 after complications from routine surgery damaged femoral nerves. Associated surgery & subsequent unemployment led to depression/anxiety." (*Id.*). He further reported Plaintiff's complaints were credible, and that Plaintiff could not sustain any type of job for a normal week at any exertional level; his medical problems would cause him to miss at least 2-5 days per month from work and affect his ability to concentrate and focus on tasks. (*Id*.).

Additionally, he reported that during a workday, Plaintiff's medical problems/conditions would require frequent and unpredictable breaks, that would most likely occur at least hourly; prevent him from climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; limit him to occasionally but infrequently lifting over 10 pounds; limit his ability to stand and/or walk for two hours; and allow him to sit for six hours, though not continuously. Dr. Alterman reported Plaintiff was prescribed Tramadol for pain, Valium for muscle spasm and anxiety, and Nitroglycerin for chest pain. (*Id.*). Plaintiff next saw Dr. Alterman in May and June 2016.  (R. 1198-204).  Dr. Alterman reported Plaintiff's anxiety and overall condition was worsening. (R. 1198).

On August 18, 2016, medical expert Dr. Alexandre B. Todorov, responded to interrogatories.[8]  (R. 1221-23).   After a review of the evidence, Dr. Todorov found Plaintiff suffered from: meralgia paresthetica; bipolar disorder, mixed, severe, without psychosis; generalized anxiety state; chest pain; and lower back pain. (R. 1221-22). In conclusion, Dr. Todorov determined that those impairments, either combined or separately, did not meet or equal any impairment in the Listing of Impairments. (R. 1222)  He noted that Plaintiff was unlikely to be able to return to his previous job lifting 80 pound blocks; was currently limited to medium level physical activities; his meralgia paresthetica may present problems in walking a long distance,

---

[8] Dr. Todorov also completed a Medical Source Statement of Plaintiff's ability to do work-related activities and concluded Plaintiff could: lift and/or carry up to 10 pounds continuously, 11 to 20 pounds frequently, 21 to 50 pounds occasionally, and 51 to 100 pounds never; sit for 4 hours, stand for 3 hours, and walk for 2 hours at one time without interruption; sit for 8 hours, stand for 6 hours, and walk for 4 hours total in an 8 hour work day; reach overhead and all other, handle, finger, feel, push/pull continuously over 2/3 with both his right and left hands; operate foot controls with his right foot continuously (over 2/3), and frequently (1/2 to 2/3) with his left foot; climb stairs and ramps frequently, ladders or scaffolds occasionally, balance, stoop, kneel, crouch, and crawl continuously; and continuously be able to tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat, vibrations, and very loud noise. Based solely on Plaintiff's physical impairments, Dr. Todorov determined Plaintiff could shop, travel without a companion, ambulate without using a wheelchair, walker, or canes, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed himself, care for his personal hygiene, and sort, handle, or use paper/files. (R. 1224-29).

squatting or crawling by the pain in the inguinal area, but Plaintiff seemed well adjusted to these issues. (R. 1223). He determined that Plaintiff's mental disability was not an issue. In his opinion, Plaintiff's bipolar disorder was mild to moderate in severity, though certainly compounded by the mental trauma of the legal difficulties with Workers' Compensation and the difficulties in finding an appropriate job. Finally, he determined that Plaintiff's "very exhaustive cardiologic work up" did not rise to the level of a cardiac dysfunction, and MRIs of his lumbar spine were normal. (*Id.*).

On January 30, 2017, Dr. Carnel at Alabama Orthopedic, Spine and Sports Medicine Associates completed a work status form and noted that, "[Plaintiff] may return to work with no limitations on: 1-30-2017 at 2:00 PM." On March 21, 2017, Plaintiff met with Dr. Alterman for a physical and completion of a physical capacities form for a disability determination. (R. 1349). On the physical capacities form Dr. Alterman reported Plaintiff could sit upright in a standard chair for less than 15 minutes, stand for less than 30 minutes, and it was expected he would have to lie down, sleep, or sit with his legs propped at waist level or above for five hours in an eight hour daytime period. (R. 1233). Additionally, Plaintiff would be expected to be off-task 60% of an 8-hour day, fail to report to work 6 days within a 30 day period, that physical activity would greatly increase his pain, and significant side effects from prescribed medications may be expected which may limit his effectiveness to perform work. (R. 1233-35). Dr. Alterman reported that these limitations had been present since March 25, 2014. (R. 1235). It was further noted that Plaintiff had requested paperwork be completed a few times in the past and the answers remained the same. (R. 1355).

Plaintiff received mental health treatment at CED Mental Health Center ("CED") beginning in November 2014 throughout August 2017. (R. 841-70, 1345). On November 19, 2014, Plaintiff stated that he could not control his emotions, was angry, felt guilty that he could not

provide for his family, and was unable to sleep. (R. 852). It was noted that Plaintiff "[t]akes no medication now. Was taking Neurotin and Cymbalta." (*Id.*). Plaintiff was diagnosed with bipolar I, mixed, severe without psychosis, and generalized anxiety disorder, and a GAF score of 50. (R. 863). Individual therapy was recommended. (*Id.*). On January 6, 2015, Dr. Fiest's evaluation of Plaintiff noted anxiety, insomnia, good insight, fair judgment, tangential thought process, thought content within normal limits, adequate attention/concentration, good appetite, fair energy/motivation, hyperactive behavior, adequate weight, and moderate risk. (R. 848). Plaintiff was prescribed Prozac and Seroquel to decrease his depression and to help him sleep. (*Id.*). On January 15, 2015, Plaintiff reported that Prozac was not helping him as he continued to have depression. Plaintiff was told to give his medications a couple more weeks. (R. 847). During his January 27, 2015 therapy session, Plaintiff reported that he noticed a difference while on Seroquel as he was sleeping better, but felt the Prozac was still not working as he was experiencing continued anxiety during the day. (R. 845-46). In a Physician's Evaluation dated March 9, 2015, Plaintiff was being prescribed Seroquel, Zoloft, and Buspar. (R. 842).

Individual/Family therapy notes from CED dated August 31, 2015 show a previous GAF score of 45 and current GAF score of 43. Plaintiff appeared more irritable than in his previous session, and stated he had been "more angry/frustrated lately." (R. 1127). When questioned about any changes, he stated his "'pain doctor' told him his CED meds were causing his 'stomach problems' and to 'prove a point' stopped taking all his [] meds, approximately 3 weeks ago." (*Id.*). On September 15, 2015, Dr. Fiest with CED listed Plaintiff's medications as Zoloft, Buspar, Seroquel, Trileptol, and Klonopin. (R. 1126). For Reported Compliance of medications, "No" was marked and it was noted "Pain doctor told [Plaintiff] CED Rx were causing his stomach problems. [Plaintiff] declined all CED Rx." (*Id.*).

Plaintiff began group therapy sessions at CED on September 21, 2015. (R. 1123-25). Therapy progress notes from Plaintiff's first week in group therapy show that Plaintiff responded well and made attempts to get as much out of the sessions as possible, and "[h]e had started taking his medication as prescribed again." (*Id.* at 1123). He reported beginning to feel more in control and that his anger was improving. (*Id.*).  Therapy notes from the week of September 28-October 3, 2015, show Plaintiff continued to struggle with anger management and was very resistant to change in this aspect; however, he did very well in group and handled some conflicts that occurred within the group, participated frequently in discussions and made attempts to be outgoing. (R. 1120-21). Therapy progress notes for the week of October 5-9, 2015 show Plaintiff was showing improvement in self-control and anger management skills.  (R. 1113-14). Dr. Fiest's Physician's Evaluation notes dated October 6, 2015 list Plaintiff's current mediations as Seroquel, Klonopin, Trileptel (not taking), and Paxil. (R. 1119). Additional notes in the Medication section show "Crisis PMA" and for Reported Compliance the "No" box was marked. (*Id.*). Plaintiff's mood/affect was marked as anxiety, sleep pattern normal, insight, judgment, energy/motivation as good, thought process logical, thought content within normal limits, attention/concentration adequate, behavior appropriate, weight increased, and risk moderate. (*Id.*).

On October 14, 2015, Plaintiff reported to Dr. Fiest that his medical doctor had stated that due to stress issues he was to receive an increase in anxiety medication. (R. 1117). Plaintiff was prescribed Buspar. (*Id.*). On October 20, 2015, Plaintiff declined the Buspar prescription, stating he had taken it previously without "symptom improvement." (R. 1116-17). Instead, he requested increased Klonopin stating, "Dr. Prime recommended increase in Klonopin for immediate/ emergency use." (*Id.* at 1117). A prescription for Klonopin was written.  (R. 1116). Eight days

later, on October 28, 2015, Plaintiff requested a rewrite of the Klonopin prescription because he washed it by accident.  (R. 1115). Dr. Fiest rewrote Plaintiff's prescription with two refills. (*Id*.).

Progress notes from Plaintiff's therapy treatment for the weeks of October 12-16 and 19-23, 2015 show he continued to make strides with his self-control and coping skills, was often a source of encouragement to his peers during group discussions, and continued to improve with communication skills and processing anger, though he continued to discount much of his progress. (R. 1107-10).

During Intensive Day Treatment for the week of November 16-20, 2015 Plaintiff attended one out of three days that treatment was offered. (R. 1099). Plaintiff reported as medication compliant and denied any adverse side effects.  (*Id*.).  However, on November 19, 2015, Plaintiff reported to Dr. Feist's office that Seroquel made him too sleepy to function, and his prescription was replaced with Neurontin. (R. 1101-02).

On December 3, 2015, a CED Progress Report shows that Plaintiff called regarding his prescriptions, stating that the "pharmacy could not read it." It was further noted that Plaintiff thought his prescription was for Wellbutrin, but when told it was for Neurotin, he stated that he did not want Neurotin. (R. 1096). In therapy during the week of December 7-11, 2015, Plaintiff attended 4 out of 5 days, reported medication compliance, and denied any adverse side effects. (R. 1145). After stating that he did not know how to meet his goal, Plaintiff was encouraged to create a goal that was measurable but declined: "'I have an anger problem, but its [sic] not my fault' and 'I'm a yankee, that's just the way it is.'" (*Id*.). Plaintiff requested a new medication "to keep me calm." (*Id*.). He admitted to taking 5 Klonopins daily for the past month. He had refused prescriptions for Neurontin, Cymbalta, and Seroquel stating, "they make me angier [sic]" and "I

don't need anything that will make me sleepy." (*Id.*). On December 10, 2015, Plaintiff signed the Program Rules for Adults Intensive Day Treatment. (R. 1147-49).

Plaintiff attended only one therapy session from December 14-31, 2015. (R. 1140-42). He notified the group that he would not be able to return until his children returned to school after the holidays. (R. 1142). The therapist noted that it appeared Plaintiff liked having an opposing view with others—he was somewhat argumentative, made other group members uncomfortable at times, was very talkative, and required redirection often as he seemed to enjoy getting reactions from others. (*Id.*). Plaintiff reported continued anxiety and stress, though no signs were observed. Further, he had some complaints regarding his anxiety medications and refused previous prescriptions from consults that had been completed. (*Id.*). He reported his diagnoses as "bipolar, intermittent explosive disorder, anxiety, stress anger, schizophrenia, PTSD" and that he was taking Paxil and Klonopin and that "Neurotin makes [him] angry." The plan for his next session/next steps was noted as "monitor symptoms and medication compliance." (R. 1143).

Progress notes from January 4-8, 2016, show that Plaintiff often had to be redirected to allow other group members to provide feedback and he enjoyed confrontation. (R. 1138). Plaintiff reported medication compliance and explained that his attendance had been inconsistent due to his children being out of school and his having problems with one of their vehicles. (*Id.*). It was recommended that if he was unable to participate consistently in day treatment, he might consider outpatient services. (R. 1139).

During the week of January 11-15, 2016, Plaintiff attended one out of five therapy sessions and did not attend any further therapy sessions for the remainder of January 2016. (R. 1131-32). He stated that his wife's job was interfering with his consistency in attending. They were sharing a vehicle and he was unable to come to day treatment when she had the car. (R. 1133-34).  During

the one therapy session Plaintiff did attend (on January 12, 2016) he was found to be argumentative and had to be redirected often. (R. 1135). Dr. Feist noted Plaintiff's progress as minimal and that he denied any history of drug abuse. (R. 1136).

Plaintiff returned and attended two days of intensive day therapy the week of February 1-5, 2016. (R. 1089-92). He stated he had difficulty affording gas money/transportation as his wife was mostly using their vehicle for work. Plaintiff endorsed medication compliance. (R. 1092). On February 2, 2016, Plaintiff contacted Dr. Feist's office requesting more Valium because he had dropped his medication (specifically, Valium) in the toilet. (R. 1130). Plaintiff later explained that he had dropped his medication "in the shower but that he had urinated in [the] shower as well." (*Id.*). Plaintiff also stated he was taking "old Klonopin" that "doesn't work." According to his Rx history report, Plaintiff had filled his Valium prescription of 120 pills on January 12, 2016, as well as a Klonopin prescription of 150 pills on January 22, 2016. (*Id.*). Plaintiff then requested that more Valium be prescribed. (*Id.*). Also, Plaintiff reported "he stopped taking Haldol 2 weeks ago because it made him feel 'edgy.'" (*Id.*).  Dr. Jonas, a medical expert, testified during the June 21, 2018 hearing that these reports indicate problems with excessive prescribing, which comes from the doctor, but also substance abuse. (R. 69). Plaintiff did not attend any further therapy sessions for the remainder of February 2016. (R. 1089-91).

On April 4, 2017, at the request of his attorney, Plaintiff was evaluated by Dr. David Wilson and a mental health source statement was completed. (R. 1236-41). Dr. Wilson diagnosed bipolar disorder I (mixed severe), and panic disorder. (R. 1241). Dr. Wilson reported that Plaintiff could not maintain attention, concentration, and/or pace for periods of at least two hours, could not perform activities within a schedule and be punctual within customary tolerances, could not sustain an ordinary routine without special supervision, could not adjust to routine and infrequent work

changes, could not interact with supervisors, could not interact appropriately with coworkers, and could not maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 1243). He reported that Plaintiff would be off-task for 4 to 6% of an eight hour day (in addition to normal workday breaks). And, Plaintiff would fail to report to work due to his psychological symptoms 25 days in a 30 day period. (*Id.*). Dr. Wilson further reported that these limitations had existed since March 25, 2014. (*Id.*). Dr. Wilson also listed sedation (Plaintiff "can't get going") and agitated as side effects of Plaintiff's medications. (*Id.*).

During an August 22, 2017 individual therapy session, Plaintiff again related that he felt worthless because he could not provide for his family. The therapist suggested vocational rehab in order to acquire training to do some other kind of work. Plaintiff declined the referral saying he would "wait for disability." (R. 1345).

On September 5, 2017, Dr. Feist, Plaintiff's psychiatrist at CED, evaluated Plaintiff and completed the same mental health source statement provided by Plaintiff's attorney as Dr. Wilson previously did on April 4, 2017. (R. 1360). Dr. Feist's findings were consistent with those of Dr. Wilson with two exceptions: Plaintiff would be expected to be off-task 80% (versus 4 to 6%) of an eight hour day in addition to normal workday breaks, and that he would fail to report to work due to his psychological symptoms 20 days (versus 25 days) in a 30 day period. (*Id.*).

## II.    ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in

16

substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).

Second, the ALJ must determine whether the claimant has a medically determinable impairment

or a combination of medical impairments that significantly limits the claimant's ability to perform

basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may

not claim disability.  *Id.*  Third, the ALJ must determine whether the claimant's impairment meets

or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.   If such criteria are met, the claimant

is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the

third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must

first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's

ability to work despite his impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ

determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R. §

404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work,

then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past

relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).

In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any

other work commensurate with his RFC, age, education, and work experience.  20 C.F.R. §

404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence,

in significant numbers, of jobs in the national economy that the claimant can do given his RFC,

age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

After considering the entire record, the ALJ made several findings. (R. 23-49). First, the

ALJ found that since March 25, 2014, Plaintiff had not engaged in substantial gainful activity. (R.

23). Second, the ALJ found that Plaintiff had the following combination of severe impairments: meralgia paresthetica, lumbar degenerative disc disease, obesity, bipolar disorder, anxiety disorder, and substance abuse. (*Id*.). The ALJ acknowledged that Plaintiff testified that he had a stroke or stroke like symptoms on September 25, 2015; however, while Dr. Prime's records indicate a diagnosis of ischemic stroke, stroke/cerebrovascular accident, testing was negative, and no other treating physician or medical expert reported that Plaintiff suffered a stroke. (R. 33). Therefore, he determined this was not a medically determinable impairment. (*Id*.).

Third, the ALJ concluded that Plaintiff's impairments, including the substance use disorder, meet the criteria of sections 12.04 and 12.06 of the Act. (*See* R. 33). The paragraph A criteria at section 12.04 are satisfied because Plaintiff was diagnosed with bipolar disorder with depressed mood, appetite disturbance, sleep disturbance, diminished interest in almost all activities, decreased energy, and difficulty concentrating or thinking. The paragraph A criteria at section 12.06 are also satisfied because Plaintiff has been diagnosed with anxiety disorder with panic attacks and avoidant behavior and fear. In order to meet the paragraph B criteria, Plaintiff's mental impairments would had to have resulted in at least two "marked" or one "extreme" limitation in the four areas of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App'x 1. The paragraph B criteria are satisfied because the ALJ found that Plaintiff has a moderate limitation in understanding, remembering, or applying information; a marked limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing himself. (R. 34).

However, the ALJ also found that in the absence of substance use, Plaintiff's medically determinable mental impairments, considered singly and in combination, would not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and are

therefore non-severe. (R. 34). Thus, Plaintiff has the severe impairments of meralgia paresthetica, lumbar degenerative disc disease, and obesity, which significantly limit Plaintiff's ability to perform basic work activities. (R. 34).

Fourth, the ALJ concluded that if Plaintiff discontinued his substance use, Plaintiff would not have an impairment or combination of impairments that meets or medically equals any of the impairments included in 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (R. 36). Additionally, while Plaintiff would be unable to perform any of his past relevant work, he does have the RFC to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b) except, as a part of the job requirement, Plaintiff would not climb ladders, ropes, or scaffolds. (R. 37, 47). Thus, the ALJ determined that if Plaintiff stopped the substance use, considering his age, education, work experience, and RFC, there would be a significant number of jobs in the national economy that Plaintiff could perform. (R. 48).

Finally, the ALJ found Plaintiff's substance use disorder is a contributing factor material to the determination of disability because he would not be disabled if he stopped the substance use. (R. 49). Because the substance use disorder is a contributing factor material to the determination of disability, Plaintiff has not been disabled under sections 216(i) and 223(d) of the Act at any time from the alleged onset date through the date of the decision. (R. 49).

## III.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the Commissioner's final decision following the denial of review by the Appeals Council, reversed, or in the alternative, remand for further consideration. Plaintiff presents six arguments for review: (1) the ALJ failed to accord proper weight to the opinion of Dr. Alterman and Dr. Fiest, his treating physician and psychiatrist respectively, and failed to show good cause for failing to do so; (2) the ALJ failed to

state with at least "some measure of clarity" the grounds for his decision in repudiating the opinion of Dr. Wilson, a one-time examining psychologist; (3) Plaintiff meets the Listings 12.04 and 12.06; (4) the ALJ's decision was not based on substantial evidence because the ALJ relied on vocational expert testimony which was not based on a correct or full statement of his limitations and impairments; (5) the ALJ improperly applied the pain standard; and (6) Plaintiff did not receive a fair hearing because the ALJ is biased against him. (Doc #9 at 37-65). The court considers each of Plaintiff's arguments below.

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See Id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*,

894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.     Discussion

### A.     The ALJ Properly Considered Plaintiff's Treating Physicians' Opinions

Plaintiff argues that the ALJ failed to accord proper weight to the opinions of his treating physician, Dr. Alterman, and his treating psychiatrist, Dr. Feist. For the reasons discussed below, the court concludes that (1) the ALJ clearly articulated his reasons for affording little weight to Dr. Alterman's opinion and less weight to Dr. Feist's assessments of disabling limitations, and (2) good cause existed for doing so in both instances.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* And, an ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

To determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of

the medical professional. 20 C.F.R. § 404.1527(c). However, opinions on some issues, such as whether the claimant is disabled and the claimant's RFC, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p; *Adams v. Comm'r, Soc. Sec. Admin.*, 586 F. App'x 531, 533 (11th Cir. 2014); *Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015).

Here, the ALJ afforded little weight to Dr. Alterman's opinion that Plaintiff cannot sustain any type of job for a normal work week as this is an opinion reserved to the Commissioner. (R. 46). Opinions on issues reserved to the Commissioner, "even when offered by a treating source, . . . can never be entitled to controlling weight or given special significance." SSR 96-5p. "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give that opinion." 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). As the ALJ articulated, "Dr. Alterman [] demonstrated no vocational knowledge or expertise, there is no statement of this type, or any supporting criteria in the correlated treatment records of Dr. Alterman or any other acceptable medical source in the relevant timeframe, consistent with Dr. Alterman's opinion in this regard, or his other opinions regarding [Plaintiff]'s limitations." (R. 46). The court agrees.

On March 16, 2016, when completing a medical information form sent to him by Plaintiff's counsel, Dr. Alterman reported Plaintiff's complaints were credible and that he cannot sustain any type of job for a normal week at any exertional level as Plaintiff 's medical problems would cause him to miss at least five days per month from work; affect his ability to concentrate

and focus on tasks; require unpredictable and frequent breaks during the workday, likely on an hourly basis; he could occasionally lift over ten pounds, but not frequently; and he could sit for six hours in a workday, but not continuously. Additionally, his medical condition prevents him from climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; standing and/or walking for two hours in a workday. (R. 1039-40). A year later, on March 21, 2017, Dr. Alterman completed a physical capacities form in which he reported that Plaintiff could: sit upright in a standard chair for less than 15 minutes; stand for less than 30 minutes; would be required to lie down, sleep, or sit with his legs propped at waist level or above for five hours in an eight hour daytime period; would be expected to be off-task 60% of an 8-hour day; and would be expected to miss 6 days of work per month. (R. 1233). Further, Dr. Alterman reported that physical activity increases Plaintiff's pain, and his prescribed medication is likely to limit his effectiveness to perform work. (R. 1235). However, as mentioned previously, the ALJ determined that Dr. Alterman's treatment records were not consistent with Plaintiff's allegations of disabling pain or limitations, and during the relevant timeframe no other acceptable medical source gave an opinion consistent with that of Dr. Alterman. (R. 46).

Starting with Dr. Alterman's own treatment records, the ALJ cited multiple instances that those records are inconsistent with disabling pain or limitations. (R. 42-43). When Dr. Alterman first treated Plaintiff, he reported Plaintiff had a normal neurological exam with normal motor strength in the upper and lower extremities and sensory exam intact. (R. 1033). Dr. Alterman reported in January and February 2016 that Plaintiff's left lower extremity was weak, but he also reported that Plaintiff's neurologic exam was non-focal, his motor strength was normal in the upper and lower extremities, and his sensory exam was intact. (R. 1020, 1024). In February 2016, Dr. Alterman reported that Plaintiff had positive straight leg raising test bilaterally with lumbar

tenderness (R. 1020), but lumbosacral spine x-rays taken in March 2016 were normal (R. 1306). In March 2017, Plaintiff complained of 8/10 hip joint pain, but it was reported that he denied gait abnormality. (R. 1351). In August 2017, Plaintiff complained of 8/10 pain in his left hip and leg, but his neurologic exam was non-focal, and he was found to have normal motor strength in his upper and lower extremities. (R. 1354).

Also, the opinions of Dr. Carnel and Dr. Jonas support the ALJ's decision to assign little weight to Dr. Alterman's opinions. Dr. Carnel treated Plaintiff from April 2015 through January 2017, following his complaints of low back and hip pain. (R. 896-97, 990-97, 1007-09, 1232, 1330-36). In December 2016, Dr. Carnel noted Plaintiff's EMG/NCS did not show clear neurocompression or issues related to his prior inguinal hernia repair surgery, an MRI had also not revealed any high-grade neurocompression, and there were no objective findings to support Plaintiff's alleged motor function issues with his left lower extremity. (R. 1334). On January 30, 2017, Dr. Carnel completed a work status form and concluded that Plaintiff could return to work with no limitations. (R. 1232).

During Plaintiff's June 21, 2018 hearing, medical expert Dr. Alfred Jonas testified that he had reviewed the evidence of record[9] which did not give a "clear and unequivocal understanding of why Plaintiff has so much pain" and did not support Dr. Alterman's opinion that Plaintiff could lift only 10 pounds. (R. 65-80, 75-77, 1040, 1077-80). Specifically, Plaintiff's October 2014 functional capacity evaluation wherein Dr. Alterman concluded that Plaintiff could only lift 10 pounds and not more, but Plaintiff actually lifted 35 to 50. (R. *Id.*). Therefore, the ALJ assigned great weight to Dr. Jonas' testimony as the only significant and credible assessment of the relevant period in its entirety. (R. 46).

---

[9] This review included additional medical evidence marked as exhibits 1F through 48F. (R. 66).

Based on the foregoing discussion, the court concludes the ALJ did not err in assigning little weight to Dr. Alterman's opinions. The ALJ clearly articulated his reasons for doing so and good cause exists for the ALJ's decision. Substantial evidence supports the ALJ's evaluation of Dr. Alterman's opinions. And, as discussed above, Dr. Alterman's opinions regarding Plaintiff's disabling limitations lacked support in his own records and the records of the other treating and examining physicians.

Plaintiff also argues the ALJ failed by according less weight to his treating psychiatrist, Dr. Fredric Feist. (Doc #9 at 39-45). On September 5, 2017, Dr. Feist completed a mental health source statement and reported that Plaintiff could not do the following: understand, remember or carry out very short and simple instructions; maintain attention, concentration, and/or pace for periods of at least two hours; perform activities within a schedule and be punctual within customary tolerances; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors; interact with coworkers; nor maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 1360). Dr. Feist further reported that, in addition to normal workday breaks, Plaintiff would be off-task 80% in an eight hour day, and would fail to report to work due to his psychological symptoms 20 days in a 30 day period. (*Id*.).

The ALJ found that Dr. Feist's opinion about Plaintiff's disabling mental limitations was inconsistent with Plaintiff's longitudinal treating mental health records from CED, and inconsistent with Plaintiff's other longitudinal treating medical records. (R. 40). The ALJ cited to several emergency room visits and records from Dr. Prime, Dr. Carnel, and Dr. Alterman from July 2014 to December 2016 wherein it was reported Plaintiff appeared alert, oriented to person, place, time, and situation, his mood and affect were appropriate, he was calm and cooperative, his

cognitive functioning was normal, and he appeared well groomed. (R. 38-39, 808, 813, 823, 832, 1050, 1057, 1333). In addition, in August 2015, Plaintiff had normal memory and a normal psychiatric exam. (R. 39, 1300).

The ALJ further cited to Dr. Feist's own treatment records, which do not indicate that Plaintiff exhibited disabling mental limitations in the absence of substance use. (R. 39). In January 2015, Dr. Feist reported that Plaintiff had good insight, fair judgment, thought content within normal limits, adequate attention/concentration, good appetite, and fair energy/motivation. (R. 39, 848). Dr. Feist reported similar results in an October 2015 report, as well. (R. 39-40, 1119). At a counseling session in August 2017, Plaintiff reported that he was experiencing mood swings, but he also reported that his medications were working. (R. 40, 1345). Plaintiff's therapist mentioned vocational rehabilitation, which the ALJ determined is an indication that she believed Plaintiff was not experiencing disabling mental limitations. (*Id.*).

The court concludes the ALJ did not err in assigning little weight to Dr. Feist's opinions. The ALJ clearly articulated his reasons for doing so. Good cause exists for the ALJ's decision, and substantial evidence supports the ALJ's assessment that Dr. Feist's opinions regarding Plaintiff's disabling mental limitations lacked support in his own records and from the records of other treating and examining physicians.

**B.    The ALJ Stated with "Some Measure of Clarity" the Grounds for Assigning Less Weight to the Opinion of Dr. Wilson**

Plaintiff argues the ALJ did not state with at least "some measure of clarity" the grounds for his decision to assign less weight to the opinion of Dr. Wilson. (Doc. #9 at 45-48). The court disagrees.

An ALJ must consider all medical opinions in a claimant's case record, together with other relevant evidence. 20 C.F.R. § 404.1527(b). "The ALJ must state with particularity the weight

given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. *Id.* "Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his decision, [the court] will decline to affirm simply because some rationale might have supported the ALJ's conclusion." *Id.*

While a treating physician's opinion is entitled to "substantial or considerable weight unless good cause is shown to the contrary," the opinions of a one-time examiner or of a non-examining medical source are not entitled to the initial deference afforded to a physician who has an ongoing relationship with a claimant. *Lewis*, 125 F.3d at 1440; *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Of interest is the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's RFC. *See*, *e.g.*, 20 C.F.R. § 404.1546(c).

On April 4, 2017, Plaintiff was evaluated by Dr. David Wilson at the request of his attorney. (R. 1236-44). Dr. Wilson diagnosed Axis I bipolar disorder I (mixed severe), and panic disorder; Axis II average intelligence; and Axis III Complications related to hernia surgeries with leg pain, numbness and weakness. (R. 1241). Dr. Wilson reported Plaintiff could not do the following: maintain attention, concentration, and/or pace for periods of at least two hours; perform activities within a schedule and be punctual within customary tolerances; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors or appropriately with coworkers; maintain socially appropriate behavior; nor adhere to basic

standards of neatness and cleanliness. (R. 1243). He further reported that in addition to normal workday breaks, Plaintiff would be off-task for 4 to 6% of an eight hour day, fail to report to work 25 days in a 30 day period due to his psychological symptoms, and that all of the noted limitations had existed since March 25, 2014. (*Id*.).

The ALJ gave less weight to Dr. Wilson's report as he found it was the result of a solitary examination at the request of Plaintiff's attorney and apparently relied heavily on the representations made by Plaintiff. (R. 46). Moreover, the ALJ determined that Dr. Wilson's findings could only represent an assessment at that finite point in time, with no relevance given to events that occurred before or after the attorney-directed evaluation. (*Id*). The court finds that substantial evidence supports the ALJ's decision to assign less weight to Dr. Wilson's opinion.

The limitations described by Dr. Wilson are inconsistent with the bulk of the other medical assessments, and his report provides no basis for the statement that the limitations related back several years to March 25, 2014. Dr. Wilson reported that Plaintiff's cognition and memory screening indicated he was able to do simple math and a more complex calculation, had good mental control and attention, and had adequate short-term memory and working memory. (R. 40, 1240). The ALJ found these findings inconsistent with Dr. Wilson's report of Plaintiff's limitations, including his opinion that Plaintiff could not maintain attention, concentration, and/or pace, and they were also inconsistent with Plaintiff's longitudinal treating medical records, including his treating mental health records from Dr. Feist (discussed above). (R. 40).

Therefore, the ALJ properly assigned only less wight to Dr. Wilson's opinion because it was inconsistent with the objective medical evidence. Specifically, the ALJ described in detail that Plaintiff's medical records and examination do not support Dr. Wilson's opinions that Plaintiff

could not maintain attention, concentration, and/or pace, and therefore has disabling mental limitations. (R. 40, 46).

### C.     Plaintiff Does Not Meet Listing 12.04 or 12.06 in the Absence of Substance Use

Plaintiff argues that the testimony of Dr. Cohen, a medical expert who appeared at the January 18, 2018 hearing, is dispositive of a determination that Plaintiff met Listings 12.04 and 12.06. To establish a presumption of disability based upon a listing at step three, a claimant must show "a diagnosis included in the Listings and must provide medical reports documenting that the conditions met the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citations omitted); 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926. Additionally, a claimant's impairments must meet or equal all of the specified medical criteria in a particular listing for the claimant to be disabled at step three. *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.

The Act precludes a finding of disability if drug or alcohol abuse would be a contributing factor that is material to a determination that a claimant is disabled. *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935; *Doughty v. Apfel*, 245 F.3d 1274, 1275 (11th Cir. 2001). A claimant bears the burden of proving that he would still be disabled if he stopped using drugs. *See Doughty*, 245 F.3d at 1275-76, 1280-81.

Substantial evidence supports the ALJ's conclusion that, in the absence of substance use, Plaintiff's medically determinable mental impairments, considered singly and in combination, do not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and are therefore non-severe. (R. 34).

At Plaintiff's hearing held January 18, 2018, Dr. Cohen testified that he reviewed the evidence of record, including exhibits 1F-43F. (R. 102-03). Dr. Cohen testified that Plaintiff met the A and C criteria of Listing sections 12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). (R. 103-04); 20 C.F.R. Pt. 404, Subpt. P, App'x 1. However, the ALJ assigned less weight to Dr. Cohen's testimony and great weight to Dr. Jonas's testimony regarding Plaintiff's mental impairments. (R. 47). Dr. Jonas testified that most of the evidence addressed Plaintiff's temper and his sense of irritability, with some references to his unstable affect, which is sometimes diagnosed as bipolar disorder in the record. (R. 69). Dr. Jonas further testified that the record also demonstrated excessive treatment for anxiety. (*Id*.). Specifically, Dr. Jonas testified that based upon the record, Plaintiff demonstrated a dynamic of substance abuse (R. 69-71)—mainly benzodiazepine sedative medications, Xanax, Valium, and some mention of Klonopin undermined Plaintiff's allegations regarding Listings 12.04, 12.06, and 12.08. (R. 69). Dr. Jonas testified that Plaintiff is taking way too much of these medications and that it was hard to tell Plaintiff's real mental symptoms other than substance abuse. (R. 69-71).

Dr. Jonas pointed to two instances, one from February 2016 and the other from January 2017, that would indicate a substance abuse problem. (R. 70). According to Plaintiff's prescription history report, Plaintiff filled his Valium prescription of 120 on January 12, 2016. (R. 1130). However, on February 2, 2016, he called Dr. Feist's office requesting more Valium as he reported he dropped his medication (specifically Valium) in the toilet, but then explained he dropped his meds in the shower and that he had urinated in the shower as well. (R. 1130). Plaintiff further stated he was taking "old Klonopin" that "doesn't work," but according to his prescription history report, he had filled a Klonopin prescription of 150 on January 22, 2016. (*Id*.). The other instance, on January 30, 2017, indicates that Plaintiff was belligerent and used foul language over a

confrontation with his treating doctor, Dr. Carnel, about a urinary drug screen that was positive for marijuana. (R. 1335). Dr. Jonas testified that these reports suggest problems with not only excessive prescribing, but also substance abuse. (R. 69).

The ALJ further found that Dr. Alterman's treatment records failed to demonstrate disabling mental limitations for Plaintiff. (R. 39). During his exams, Dr. Alterman reported Plaintiff was well groomed, cooperative, had good attention, was oriented to person, place, and time, and had appropriate affect, with moderate depression. (R. 1020, 1024, 1029, 1158, 1203).

As a result of this evidence, the ALJ determined Plaintiff's substance abuse was a contributing factor material to the determination of disability. (R. 34-35). Plaintiff failed to cite objective mental status findings or other acceptable evidence from the medical records, absent his substance use disorder, that indicates Plaintiff had limitations on his ability to work beyond the limitations found by the ALJ in his assessment of Plaintiff's RFC. (R. 37-47). Therefore, substantial evidence supports the ALJ's finding that Plaintiff's mental condition did not meet or equal Listings 12.04 and 12.06. (R. 33-36).

### D.    The Vocational Expert's Testimony was Substantial Evidence Supporting the ALJ's Decision

Plaintiff argues the ALJ's decision was not based on substantial evidence because the ALJ relied on vocational expert testimony that was not based on a correct or full statement of Plaintiff's limitations and impairments. (Doc. #9 at 50). Plaintiff contends the ALJ's hypothetical should have included Plaintiff's impairments caused by depression, anxiety, and mood disorders. (Doc. #9 at 51).

For the testimony of a vocational expert "to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). However, an ALJ is not required to include findings in the

hypothetical that they have properly rejected as unsupported. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). During the June 21, 2018 hearing, the ALJ asked Vocational Expert Peacock to assume a hypothetical individual with the same general profile as Plaintiff regarding age, stated educational background, past work experience, and RFC.  The ALJ then asked four separate hypothetical questions, each with varying and increasing degrees of limitations, similar to those of Plaintiff. (R. 90-95). Based on the answers provided by the Vocational Expert, the ALJ determined that if Plaintiff stopped the substance abuse, he would have the RFC to perform light work. (R. 37-47).

As previously noted, the court concludes there is substantial evidence to support the ALJ's finding that "in the absence of substance abuse, Plaintiff's medically determinable mental impairments, considered singly and in combination, do not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and are therefore non-severe." (R. 34). Thus, the ALJ's decision not to include Plaintiff's impairments of depression, anxiety, and mood disorders in the hypothetical was proper.

### E.      The ALJ Properly Applied the Pain Standard

Plaintiff next argues the ALJ did not properly consider the evidence of record in evaluating his subjective statements of disabling limitations. (Doc. #9 at 51-59). When a claimant attempts to establish disability through his testimony of pain or other subjective symptoms, the three-part pain standard applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). To meet the pain standard, a claimant must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of his alleged symptoms or evidence establishing that his medical condition could be reasonably expected to give rise to his alleged symptoms. *Id.* An ALJ may discredit a claimant's subjective testimony of pain if he does so specifically and articulates his

reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate adequate reasons for discrediting a claimant's subjective complaints requires that the testimony be accepted as true. *Id.* However, "a clearly articulated credibility finding with substantial evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations. (R. 38). "However, the statements of [Plaintiff] and his concerning the intensity, persistence, and limiting effects of these symptoms in the absence of substance use are inconsistent with the objective medical evidence, treatment regimen and response to treatment, and daily activities." (*Id.*). Substantial evidence supports the ALJ's determination.

The ALJ provided specific reasons for discrediting Plaintiff's testimony about the effects of his pain or other symptoms. As the ALJ noted, Plaintiff's treatment records did not support his allegations. (R. 37-38). For example, Dr. Turnley repeatedly noted that Plaintiff did not demonstrate motor weakness, and his complaints were of uncertain etiology. (R. 808, 813). Plaintiff reported to Dr. Turnley during his July 2014 exam that his pain levels were 5/10, but stated that the pain can increase to levels as high as 8/10 and 10/10. And, the pain was constant. (R. 805). The ALJ also noted that Plaintiff did not properly participate during his October 2014 functional capacity evaluation and, later that month, Plaintiff demonstrated a lift level of 53 pounds during a second functional capacity evaluation. (R. 37-38, 1077-80, 1081-83). The ALJ also discussed the reports of Dr. Carnel (R. 42), who reported Plaintiff demonstrated grossly normal muscle strength and tone and normal lumber alignment and gait, ambulating unassisted, during his

August 2016 exam. (R. 1330-31). Dr. Carnel also completed a work status form in January 2017 wherein he concluded that Plaintiff could return to work with no limitations. (R. 1232).

An ALJ may consider a claimant's daily activities when evaluating his subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3). Here, Plaintiff reported that his daily activities include caring for his dogs, seeing his children off to school, making his wife's lunch, light housework, grooming himself, watching television, playing video games, and cooking. (R. 571-75, 1240). The ALJ considered all of this relevant evidence in evaluating Plaintiff's subjective complaints, and substantial evidence supports his decision.

### F.     There Is No Evidence the ALJ was Biased Towards Plaintiff

Finally, Plaintiff argues that the ALJ was biased against him. This is not the first time Plaintiff's counsel has argued an ALJ is biased against his client. *See Reaves v. Saul*, 4:19-cv-1822, Doc. # 10 (N.D. Ala. Sept. 28, 2020). That argument was directed at a different ALJ. It failed. *Id*. at Doc. # 14, pp. 11-13. This one fares no better.

A presumption exists that judicial and quasi-judicial officers such as ALJs are unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). That presumption can be rebutted by showing a conflict of interest or some other specific reason warranting the ALJ's disqualification. *Id.* The party asserting a disqualifying interest bears the burden of establishing its existence. *Id.* at 196. Bias is shown where an objective, fully-informed lay person would have significant doubt about a judge's impartiality. *In re Walker*, 532 F.3d 1304, 1310 (11th Cir. 2008). Generally, in order for bias to disqualify a judge, it must stem from an extrajudicial source, except where a judge's remarks in a judicial context show such pervasive bias and prejudice that it constitute bias against a party. *Id.* at 1310-11. Judicial rulings, routine administrative efforts, and ordinary admonishments (whether or not legally supportable) to counsel and witnesses that occur

during the course of judicial proceedings that neither rely upon knowledge acquired outside of such proceedings nor display a deep-seated and unequivocal antagonism rendering fair judgment impossible are inadequate grounds for recusal. *Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

The record falls far short of supporting a claim that ALJ Reeves was biased or prejudiced against Plaintiff. Although Plaintiff argues the ALJ's bias was shown by his refusal to recuse himself, Plaintiff offered no evidence of extrajudicial influence or the display of unequivocal antagonism. (Doc. #9 at 60-65). First, Plaintiff argues the ALJ substituted his opinions for those of the medical experts. (Doc. #9 at 60-61). But, as previously discussed, that argument fails. Determinations of disability are left to the Commissioner and the ALJ clearly articulated his reasons for assigning the amount of weight to each medical opinion. (R. 37-47). Second, Plaintiff argues the ALJ is biased against Social Security claimants. (Doc. #9 at 60-65). Plaintiff cites to the ALJ's low approval rating. (Doc. #9 at 60). But, as the Supreme Court has recognized, an ALJ's low approval rating is insufficient in and of itself to show bias. *See Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982) (a generalized assumption of bias derived from an ALJ's low approval rate is insufficient to rebut the presumption of impartiality); *Putnam v. Soc. Sec. Adm'n Comm'r*, 705 F. App'x 929, 935 (11th Cir. 2017) (holding that there must be particularized showing of a reason for disqualification to prove bias and not a generalized assumption of bias). Accordingly, Plaintiff failed to meet his burden of showing the ALJ was biased in his particular case.

## VI.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination.

The Commissioner's final decision is therefore due to be affirmed.  A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this October 28, 2020.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE